United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**
No. 97-1757

Mille Lacs Band of Chippewa Indians;      *
Arthur Gahbow; Walter Sutton; Carleen     *
Benjamin; Joseph Dunkley;                  *
                                           *
     Plaintiffs-Appellees,                *
                                           *
United States of America; St. Croix        *
Chippewa Indians of Wisconsin; Lac du      *
Flambeau Band of Lake Superior             *
Chippewas; Bad River Band of Lake          *
Superior Chippewa Indians; Lac Courte      *
Oreilles Band of Lake Superior             *
Chippewa Indians of Wisconsin;             *
Sokaogan Chippewa Community; Red           *
Cliff Band of Lake Superior Chippewa;      *
                                           *
     Intervenors-Plaintiffs-Appellees,    *
                                           *      Appeal from the United States
     v.                                   *      District Court for the
                                           *      District of Minnesota.
State of Minnesota; Minnesota              *
Department of Natural  Resources;          *
Rodney Sando, Commissioner of              *
Natural Resources;                         *
                                           *
     Defendants,                          *
                                           *
County of Aitkin; County of Benton;        *
County of Sherburne; County of Crow        *
Wing; County of Isanti; County of          *
Kanabec; County of Mille Lacs; County      *

of Morrison; County of Pine;      *
     Intervenors-Defendants-      *
     Appellants,      *
----------------------------------------------- *
Fond du Lac Band of Chippewa      *
Indians; Robert Peacock; Peter Defoe;      *
Clifton Rabideaux; Herman Wise;      *
George Dupuis;      *
           *
     Plaintiffs-Appellees,      *
           *
     v.      *
           *
Arne Carlson, Governor of Minnesota;      *
Rodney Sando, Commissioner of the      *
Minnesota Department of Natural      *
Resources; Raymond B. Hitchcock,      *
Assistant Commissioner of Operations,      *
Minnesota Department of Natural      *
Resources;      *
           *
     Defendants,      *
           *
County of Aitkin; County of Benton;      *
County of Sherburne; County of Crow      *
Wing;  County of Isanti; County of      *
Kanabec; County of Mille Lacs;      *
County of Morrison; County of Pine;      *
           *
     Movants-Appellants.      *

_____

No. 97-1764
_____

Mille Lacs Band of Chippewa Indians;      *

Arthur Gahbow; Walter Sutton; Carleen     *
Benjamin; Joseph Dunkley;                 *
                                          *
    Plaintiffs-Appellees,            *
                                          *
United States of America; St. Croix       *
Chippewa Indians of Wisconsin; Lac du     *
Flambeau Band of Lake Superior            *
Chippewas; Bad River Band of Lake         *
Superior Chippewa Indians; Lac Courte     *
Oreilles Band of Lake Superior            *
Chippewa Indians of Wisconsin;            *
Sokaogan Chippewa Community; Red          *
Cliff Band of Lake Superior Chippewa;     *
                                          *
    Intervenors-Plaintiffs-Appellees,  *
                                          *
    v.                                *
                                          *
State of Minnesota; Minnesota             *
Department of Natural  Resources;         *
                                          *
    Defendants,                       *
                                          *
County of Aitkin; County of Benton;       *
County of Sherburne; County of Crow       *
Wing; County of Isanti; County of         *
Kanabec; County of Mille Lacs; County     *
of Morrison; County of Pine;              *
                                          *
    Intervenors-Defendants,           *
                                          *
John W. Thompson; Jenny Thompson;         *
Joseph Karpen; Leroy Burling; Glenn       *
Thompson; Gary Kiedrowski;                *
                                          *
    Intervenors-Defendants-           *

Appellants.                          *

_____

No. 97-1768

_____

Fond du Lac Band of Chippewa            *
Indians; Robert Peacock; Peter Defoe;   *
Clifton Rabideaux; Herman Wise;         *
George Dupuis;                          *
                                        *
    Plaintiffs-Appellees,          *
                                        *
    v.                             *
                                        *
John Thompson; Jenny Thompson;          *
Glenn Thompson; Joseph Karpen;          *
Leroy Burling; Gary Kiedrowski;         *
                                        *
    Movants-Appellants,            *
                                        *
Robert J. Edmonds; Michael Sheff;       *
                                        *
    Movants,                       *
                                        *
Arne Carlson, Governor of Minnesota;    *
Rodney Sando, Commissioner of the       *
Minnesota Department of Natural         *
Resources; Raymond B. Hitchcock,        *
Assistant Commissioner of Operations,   *
Minnesota Department of Natural         *
Resources;                              *
                                        *
    Defendants,                    *
                                        *
County of Aitkin; County of Benton;     *
County of Sherburne; County of Crow     *

Wing; County of Isanti; County of     *
Kanabec; County of Mille Lacs; County  *
of Morrison; County of Pine;           *
                                       *
    Movants.       *

_____

_____

No. 97-1770

_____

Fond du Lac Band of Chippewa           *
Indians; Robert Peacock; Peter Defoe;  *
Clifton Rabideaux; Herman Wise;        *
George Dupuis;                         *
                                       *
    Plaintiffs-Appellees,  *
                                       *
    v.              *
                                       *
John Thompson; Jenny Thompson;         *
Glenn Thompson; Joseph Karpen;         *
Leroy Burling; Gary Kiedrowski;        *
                                       *
    Movants,        *
                                       *
Arne Carlson, Governor of Minnesota;   *
Rodney Sando, Commissioner of the      *
Minnesota Department of Natural        *
Resources; Raymond B. Hitchcock,       *
Assistant Commissioner of Operations,  *
Minnesota Department of Natural        *
Resources;                             *
                                       *
    Defendants,     *
                                       *
County of Aitkin; County of Benton;    *

County of Sherburne; County of Crow       *
Wing; County of Isanti; County of         *
Kanabec; County of Mille Lacs; County     *
of Morrison; County of Pine;              *
                                          *
    Movants,          *
                                          *
Robert J. Edmonds; Michael Sheff,         *
                                          *
    Intervenors-Defendants-   *
    Appellants.        *

—————————

No. 97-1771

—————————

Fond du Lac Band of Chippewa              *
Indians; Robert Peacock; Peter Defoe;     *
Clifton Rabideaux; Herman Wise;           *
George Dupuis;                            *
                                          *
    Plaintiffs-Appellees,     *
                                          *
    v.                 *
                                          *
John Thompson; Jenny Thompson;            *
Glenn Thompson; Joseph Karpen;            *
Leroy Burling; Gary Kiedrowski;           *
                                          *
    Movants,           *
                                          *
Arne Carlson, Governor of Minnesota;      *
Rodney Sando, Commissioner of the         *
Minnesota Department of Natural           *
Resources; Raymond B. Hitchcock,          *
Assistant Commissioner of Operations,     *
Minnesota Department of Natural           *

Resources;                                    *
                                              *
      Defendants-Appellants,          *
                                              *
County of Aitkin; County of Benton;           *
County of Sherburne; County of Crow           *
Wing; County of Isanti; County of             *
Kanabec; County of Mille Lacs; County         *
of Morrison; County of Pine;                  *
                                              *
      Movants,                        *
                                              *
Robert J. Edmonds; Michael Sheff,             *
                                              *
      Intervenors-Defendants.         *


_____

No. 97-1772

_____


Mille Lacs Band of Chippewa Indians;          *
Arthur Gahbow; Walter Sutton; Carleen         *
Benjamin; Joseph Dunkley;                      *
                                              *
      Plaintiffs-Appellees,           *
                                              *
United States of America; St. Croix            *
Chippewa Indians of Wisconsin; Lac du          *
Flambeau Band of Lake Superior                 *
Chippewas; Bad River Band of Lake              *
Superior Chippewa Indians; Lac Courte          *
Oreilles Band of Lake Superior                 *
Chippewa Indians of Wisconsin;                 *
Sokaogan Chippewa Community; Red               *
Cliff Band of Lake Superior Chippewa;          *
                                              *

-12-

Intervenors-Plaintiffs-Appellees,    *
   *

v.    *
   *

State of Minnesota; Minnesota    *
Department of Natural Resources;    *
Rodney Sando, Commissioner of    *
Natural Resources;    *
   *

Defendants-Appellants,    *
   *

County of Aitkin; County of Benton;    *
County of Sherburne; County of Crow    *
Wing; County of Isanti; County of    *
Kanabec; County of Mille Lacs; County    *
of Morrison; County of Pine;    *
   *

Intervenors-Defendants.    *

_____

No. 97-1774
_____

Mille Lacs Band of Chippewa Indians;    *
Arthur Gahbow; Walter Sutton; Carleen    *
Benjamin; Joseph Dunkley;    *
   *

Plaintiffs-Appellees,    *
   *

United States of America; St. Croix    *
Chippewa Indians of Wisconsin; Lac du    *
Flambeau Band of Lake Superior    *
Chippewas; Bad River Band of Lake    *
Superior Chippewa Indians; Lac Courte    *
Oreilles Band of Lake Superior    *
Chippewa Indians of Wisconsin;    *

Sokaogan Chippewa Community; Red          *
Cliff Band of Lake Superior Chippewa;     *
                                          *
    Intervenors-Plaintiffs-Appellees,     *
                                          *
    v.                                    *
                                          *
State of Minnesota; Minnesota             *
Department of Natural  Resources;         *
Rodney Sando, Commissioner of             *
Natural Resources;                        *
                                          *
    Defendants,                           *
                                          *
County of Aitkin; County of Benton;       *
County of Sherburne; County of Crow       *
Wing; County of Isanti; County of         *
Kanabec; County of Mille Lacs; County     *
of Morrison; County of Pine;              *
                                          *
    Intervenors-Defendants-               *
    Appellants.                           *

_____

No. 97-1937

_____

Mille Lacs Band of Chippewa Indians;      *
                                          *
    Plaintiffs-Appellants,                *
                                          *
Arthur Gahbow; Walter Sutton; Carleen     *
Benjamin; Joseph Dunkley;                 *
                                          *
    Plaintiffs,                           *
                                          *
United States of America;                 *

*

|  |  |
|---|---|
|  | * |
| Intervenors-Plaintiffs, | * |
|  | * |
| St. Croix Chippewa Indians of | * |
| Wisconsin; Lac du Flambeau Band of | * |
| Lake Superior Chippewas; Bad River | * |
| Band of Lake Superior Chippewa | * |
| Indians; Lac Courte Oreilles Band of | * |
| Lake Superior Chippewa Indians of | * |
| Wisconsin; Sokaogan Chippewa | * |
| Community; Red Cliff Band of Lake | * |
| Superior Chippewa; | * |
|  | * |
| Intervenors-Plaintiffs-Appellants, | * |
|  | * |
| v. | * |
|  | * |
| State of Minnesota; Minnesota | * |
| Department of Natural Resources; | * |
| County of Aitkin; County of Benton; | * |
| County of Sherburne; County of Crow | * |
| Wing; County of Isanti; County of | * |
| Kanabec; County of Mille Lacs; County | * |
| of Morrison; County of Pine; | * |
|  | * |
| Defendants-Appellees, | * |
|  | * |
| John W. Thompson; Jenny Thompson; | * |
| Joseph Karpen; Leroy Burling; Glenn | * |
| Thompson; Gary Kiedrowski; | * |
|  | * |
| Intervenor-Defendant-Appellees. | * |

_____

-18-

No. 97-1938
_____

Fond du Lac Band of Chippewa          *
Indians; Robert Peacock; Peter Defoe;  *
Clifton Rabideaux; Herman Wise;        *
George Dupuis;                         *
                                       *
    Plaintiffs-Appellants,              *
                                       *
    v.                                   *
                                       *
John Thompson; Jenny Thompson;         *
Glenn Thompson; Joseph Karpen;         *
Leroy Burling; Gary Kiedrowski;        *
                                       *
    Movants-Appellees,                   *
                                       *
Arne Carlson, Governor of Minnesota;   *
Rodney Sando, Commissioner of the      *
Minnesota Department of Natural        *
Resources; Raymond B. Hitchcock,       *
Assistant Commissioner of Operations,  *
Minnesota Department of Natural        *
Resources;                             *
                                       *
    Defendants-Appellees,                *
                                       *
Robert J. Edmonds; Michael Sheff,      *
                                       *
    Intervenors-Defendants-             *
    Appellees.                           *


_____

Submitted:  June 12, 1997
Filed:  August 26, 1997

-19-

_____

Before McMILLIAN, LAY, and JOHN R. GIBSON, Circuit Judges.

_____


LAY, Circuit Judge.


I.  BACKGROUND


A.  Introduction


One hundred sixty years ago, near Fort Snelling, Minnesota, representatives of the United States and representatives of twelve bands of the Chippewa Nation negotiated a treaty which ceded Indian[1] title to certain lands in the Upper Midwest. Historical documents demonstrate that the government was interested in purchasing the land for purposes of harvesting its pine timber.  See 1837 Treaty Journal 131; Letter from Commissioner of Indian Affairs Carey A. Harris to Henry Dodge, Wisconsin Territorial Governor, and General W.R. Smith (May 13, 1837).  On July 29, 1837, the Bands signed a treaty ceding over thirteen million acres of land in present-day Wisconsin and Minnesota to the United States in exchange for money, goods, and supplies.  Treaty with the Chippewas, July 29, 1837, 7 Stat. 536 .  Article V of the Treaty provided, "[T]he privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied to the

_____

[1]The plaintiff Bands in this case have referred to themselves throughout as Bands of Chippewa Indians, though, as the district court noted, "Chippewa," "Ojibwa," or "Ojibwe" are all terms "used by experts and others to refer to the same group of Native American people."  Mille Lacs Band of Chippewa Indians v. Minnesota, 861 F. Supp. 784, 790 n.5 (D. Minn. 1994).  We echo and adopt the district court's conclusion: "Since the words Chippewa and Indians are those which have been used legally [and by the parties], they are adopted in this opinion."  Id.

Indians, during the pleasure of the President of the United States." These usufructuary rights form the subject matter of the present litigation.

In 1990, the Mille Lacs Band of Chippewa Indians and some of its individual members (the Mille Lacs Band), later joined by the Fond du Lac Band of Chippewa Indians and some of its individual members[2] (the Fond du Lac Band) and several Wisconsin Bands of Chippewa Indians (the Wisconsin Bands)[3] (collectively "the Bands") sought a declaratory judgment in federal district court as to the continued existence of their usufructuary rights in the Minnesota portion of the territory they ceded in the 1837 Treaty. The Bands also sought injunctive relief to enforce these treaty rights to hunt, fish, and gather in the ceded lands free of state regulation.

1. Mille Lacs I (Mille Lacs Band of Chippewa Indians v. Minnesota, 853 F. Supp. 1118 (D. Minn. 1994))

In the Mille Lacs case, the Mille Lacs Band initially sued the State, the Minnesota Department of Natural Resources, and the Commissioner of Natural Resources (collectively "the State"). Nine Minnesota counties[4] and six Minnesota

---

[2]The Fond du Lac Band and its members filed suit separately, under both the 1837 Treaty and a separate treaty signed in 1854.

[3]The Wisconsin Bands include the St. Croix Chippewa Indians, Lac du Flambeau Band, Bad River Band of Lake Superior, Lac Corte Oreilles Indians, Sokaogan Chippewa Community, and Red Cliff Band of Lake Superior. The Wisconsin Bands' treaty rights in the Wisconsin portion of the 1837 ceded territory have been adjudicated in litigation in federal courts in Wisconsin. See Lac Courte Oreilles Band of Chippewa Indians v. Voigt, 700 F.2d 341 (7th Cir. 1983) (LCO); see also infra note 19 (explaining the LCO litigation).

[4]The counties are Aitkin, Benton, Crow Wing, Isanti, Kanabec, Mille Lacs, Morrison, Pine, and Sherburne; they will be referred to throughout this opinion as "the Counties."

landowners[5] intervened as defendants, and the United States intervened as a plaintiff. Mille Lacs I, 853 F. Supp. at 1123.

The district court bifurcated the Mille Lacs case into two phases. Phase I was to decide whether the Mille Lacs Band's rights to hunt, fish, and gather under the 1837 Treaty continue to exist and the general nature of any such rights, including whether they extend to lands now or previously in private ownership. Phase II was to decide resource allocation issues and the validity of particular measures to regulate the exercise of the rights. Id.

In Mille Lacs I, on cross-motions for summary judgment, the district court [6] held that (1) various delay-based defenses do not bar the Mille Lacs Band's claims, id. at 1124-26, 1127-28, 1138-39, (2) the Mille Lacs Band and the Commissioner of Natural Resources are persons within the meaning of 42 U.S.C. § 1983, id. at 1126-27, (3) the suit is not barred by the Eleventh Amendment, id. at 1128-29, (4) the Commissioner of Natural Resources is not exempt from suit under the doctrine of qualified immunity and other parties urged by the State are not indispensable, id. at 1129-31, and (5) the Band's claims are not precluded by res judicata or collateral estoppel, id. at 1132-38. The court also rejected the State's motion for summary judgment which argued that an 1850 Executive Order and an 1855 Treaty extinguished the Band's usufructuary rights. Id. at 1142-43. Finally, the court dismissed counterclaims the six Minnesota landowners brought against the United States. Id. at 1143-46.

2. Mille Lacs II (Mille Lacs Band of Chippewa Indians v. Minnesota, 861 F. Supp. 784 (D. Minn. 1994))

---

[5]The landowners are John W. Thompson, Jenny Thompson, Joseph N. Karpen, LeRoy Burling, Glenn E. Thompson, and Gary M. Kiedrowski.

[6]The Honorable Diana E. Murphy, then-Chief United States District Judge for the District of Minnesota.

After a trial held on Phase I issues, the district court ruled that the Mille Lacs Band had a continuing right to hunt, fish, and gather pursuant to the 1837 Treaty. Mille Lacs II, 861 F. Supp. at 841. Specifically, the court held that neither the 1850 Executive Order nor the 1855 Treaty extinguished the usufructuary rights reserved in the 1837 Treaty. Id. at 823-35. In addition, the court held that the usufructuary rights reserved by the Band included the rights to harvest resources for commercial purposes, and were not limited to use of any particular techniques, methods, devices or gear. Id. at 838. Finally, it ruled that any regulation imposed by the State must be necessary to ensure public health and safety, and that the State could not impose its own regulations if the Chippewa could establish tribal regulations adequate to meet conservation, public health and public safety needs. Id. at 838-39.[7]

3. Mille Lacs III (Mille Lacs Band of Chippewa Indians v. Minnesota, No. 3-94-1226 (D. Minn. Mar. 29, 1996))

After the Phase I order in Mille Lacs II, several Wisconsin Bands[8] of Chippewa were allowed to intervene as plaintiffs. The State moved for summary judgment against the Wisconsin Bands, arguing that previous litigation before the Court of Claims and the Indian Claims Commission barred their claims, and that a treaty signed by the Wisconsin Bands in 1854 extinguished any usufructuary rights guaranteed in the 1837 Treaty. Mille Lacs III, slip op. at 7. The Counties moved for summary judgment

---

[7]After the Phase I trial, the State, the Counties, and the six Minnesota landowners immediately appealed the Mille Lacs II decision. See 861 F. Supp. at 840. This court dismissed the appeals from the district court's Phase I order as premature. 48 F.3d 373 (8th Cir. 1995). The Counties and the six Minnesota landowners also moved for a preliminary injunction to prevent the Mille Lacs Band from violating state and federal conservation laws pending resolution of the case. The district court denied their request, 864 F. Supp. 102 (D.Minn. 1994), and this court affirmed, 66 F.3d 332 (8th Cir. 1995) (unpublished table decision).

[8]See supra n.2.

against the Wisconsin Bands as well, arguing that at the time of the 1837 Treaty, the Wisconsin Bands did not occupy lands or exercise hunting and fishing rights in Minnesota, and that this fact barred their claim. The Counties also argued, despite the ruling in Mille Lacs I, that the 1850 Executive Order extinguished the Wisconsin Bands' rights. Id. The six Minnesota landowners also moved for summary judgment against the Wisconsin Bands, and the Wisconsin Bands and the Mille Lacs Band moved for summary judgment dismissing various defenses. Id. at 7-8. The district court[9] issued summary judgment in favor of the Wisconsin Bands, and denied the defendants' motions for summary judgment. Id. at 41-42.

4. Fond du Lac (Fond du Lac Band of Chippewa Indians v. Carlson, No. 5-92-159 (D. Minn. Mar. 18, 1996))

In 1992, the Fond du Lac Band brought a separate suit against state officials, also claiming continuing rights to hunt, fish, and gather pursuant to the 1837 Treaty and its 1854 Treaty. Two Minnesota landowners intervened as defendants.[10] The district court issued a bifurcation order similar to the order signed in the Mille Lacs case. In October 1994, the court [11] held that the Fond du Lac Band's claims were not barred by Eleventh Amendment, indispensable parties or statute of limitations defenses. This court affirmed the rejection of the Eleventh Amendment defense in an interlocutory appeal. Fond du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253 (8th Cir. 1995). In March 1996, the district court issued a ruling on Phase I issues, holding that

---

[9]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

[10]These landowners are Robert J. Edmonds and Michael Sheff. All eight landowners (the two in Fond du Lac and the six in Mille Lacs) will be referred to throughout this opinion as "the Landowners."

[11]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

the Fond du Lac Band retains hunting, fishing, and gathering rights under both the 1837 Treaty and the 1854 Treaty.

5. Mille Lacs IV (Mille Lacs Band of Chippewa Indians v. Minnesota, 952 F. Supp. 1362 (D. Minn. 1997))

In June 1996, the district court consolidated Phase II of the Mille Lacs case with the portion of the Fond du Lac case relating to the 1837 Treaty. In the consolidated Phase II, the State and the Bands stipulated to a Conservation Code and Management Plan, under which tribal hunting, fishing, and gathering would be regulated. Though the State and the Bands were able to resolve many issues through this stipulation, some issues remained unresolved, and were submitted to the district court on motions for summary judgment. On January 29, 1997, the district court[12] issued an order resolving these issues. It approved the Conservation Code and Management Plan and rejected defendants' arguments to make a further allocation of the resources affected by the Code and Plan. Mille Lacs IV, 952 F. Supp. at 1385-94. The court also held that exercise of treaty rights on private lands would be limited to those open to the public by operation of state law, but that the Bands may not hunt on unposted, unenclosed, nonagricultural lands open to public hunting pursuant to state statute. Id. at 1376-79.

The Fond du Lac case and the Mille Lacs case were consolidated on appeal.[13] The basic issues presented on appeal are (1) whether the suit is barred in federal court under the Eleventh Amendment; (2) whether the 1850 Executive Order issued by President Zachary Taylor revoked the Bands' usufructuary rights; (3) whether subsequent treaties of 1854 and 1855 have extinguished the usufructuary rights; (4) whether the claims asserted by the Bands have been precluded by prior litigation; (5)

---

[12]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

[13]Jurisdiction of this appeal is authorized under 28 U.S.C. § 1291.

whether the Bands' rights were repealed, under the equal footing doctrine, by Minnesota's admission into the Union; (6) whether the rights, if they still exist, are limited by the "moderate living" doctrine; (7) whether several other affirmative defenses were erroneously rejected by the district court; and (8) in the Bands' cross-appeal, whether the district court erred in barring the Bands from hunting on unposted, unenclosed, nonagricultural lands open to public hunting.

## II.

Eleventh Amendment

We turn initially to the Landowners' arguments that these suits are barred in federal court because of the sovereign immunity of the State of Minnesota.[14] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Bands are accorded the same status as a foreign sovereign. Blatchford v. Native Village of Noatak, 501 U.S. 775, 780 (1991).

---

[14]The State does not raise the Eleventh Amendment defense in its brief, and we question whether the Landowners have standing to raise the defense on behalf of the State. However, the Landowners filed a letter pursuant to F.R.A.P. 28(j) asserting as additional authority to support the Eleventh Amendment claim the Supreme Court's recent decision of Idaho v. Coeur d'Alene Tribe of Idaho, 117 S.Ct. 2028 (1997). In response, the State filed a letter joining in the Landowners' defense. Normally, if an issue is not raised in the brief itself, nor argued at the time of oral argument, it is deemed waived. Bechtold v. City of Rosemount, 104 F.3d 1062, 1068 (8th Cir. 1997). Nonetheless, assuming without deciding that the issue is properly before us, we reject it on the merits.

In <u>Mille Lacs</u>, the State raised the defense of sovereign immunity before the district court,[15] which rejected it on two grounds. First, the court noted that the claims by the United States are not barred by the Eleventh Amendment, citing <u>Blatchford</u>, 501 U.S. at 782-83, and <u>United States v. Minnesota</u>, 270 U.S. 181, 195 (1926). <u>Mille Lacs I</u>, 853 F. Supp. at 1128. Therefore, the court held that because "the Band and the United States seek the same relief in this action, Minnesota's sovereign immunity is not compromised." <u>Id.</u> (citing <u>Arizona v. California</u>, 460 U.S. 605, 613-14 (1983)). Second, the court ruled that the Band's claim for prospective relief against the Commissioner of Natural Resources in his official capacity falls within the Eleventh Amendment exception set out in <u>Ex parte Young</u>, 209 U.S. 123 (1908).[16] <u>Mille Lacs I</u>, 853 F. Supp. at 1128-29.[17]

As to the court's first holding, the Landowners urge that the United States did not initiate the suit and appears only as a trustee intervening in the action. This observation, while true, is not controlling. The United States has fully participated in all proceedings on behalf of the Bands. As an intervenor, it has the right to continue the suit even without the presence of the Bands. <u>See Diamond v. Charles</u>, 476 U.S. 54, 68 (1986). Therefore, because the United States has the right to bring these claims in federal court, the State's sovereign immunity is not compromised and the Eleventh Amendment does not bar these claims. <u>See Arizona v. California</u>, 460 U.S. at 614

---

[15]The State is a defendant in the <u>Mille Lacs</u> suit, but not in the <u>Fond du Lac</u> suit.

[16]The <u>Ex parte Young</u> doctrine excepts from the Eleventh Amendment bar suits "brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law." <u>Fond du Lac</u>, 68 F.3d at 255.

[17]The district court in <u>Mille Lacs III</u> similarly rejected the argument by the State and the Landowners that the Wisconsin Bands' claims must be dismissed on Eleventh Amendment grounds. The court relied on the earlier decision in <u>Mille Lacs I</u>, and on this court's opinion in <u>Fond du Lac</u>. <u>Mille Lacs III</u>, slip op. at 11.

("Nothing in the Eleventh Amendment has ever been seriously supposed to prevent a State [from] being sued by the United States.") (internal quotations omitted).

In Fond du Lac, the district court denied the defendant state officials' motion for summary judgment based on Eleventh Amendment immunity. Our affirmance rejected this defense on the ground that the claims fell within the Ex parte Young exception to the Eleventh Amendment. Fond du Lac, 68 F.3d at 256-57. As such, that ruling is the law of the case in Fond du Lac, unless superseded by an intervening Supreme Court case. See Uhl v. Swanstrom, 79 F.3d 751, 755 (8th Cir. 1996) (noting that the "'law of the case' doctrine does not apply when an intervening decision from a higher tribunal renders a prior determination erroneous").

The Landowners filed a 28(j) letter, with which the State concurred, asserting that this court's ruling in Fond du Lac was in error and has now been superseded by the Supreme Court's decision in Idaho v. Coeur d'Alene Tribe of Idaho, 117 S.Ct. 2028 (1997). We disagree. In Coeur d'Alene, the Coeur d'Alene Tribe and several individual tribe members sued the State of Idaho and various state officials and agencies in federal court "[a]lleging ownership in the submerged lands and bed of Lake Coeur d'Alene and of the various navigable rivers and streams that form part of its water system." Id. at 2032. The Court held that the action was barred in federal court because it was the "functional equivalent of a quiet title action which implicates special sovereignty interests" and therefore did not fall within the Ex parte Young exception to the Eleventh Amendment. Id. at 2040.

The principal decision, written by Justice Kennedy, espouses a case-by-case balancing approach for applying the Ex parte Young exception. See id. at 2038-40. However, the majority of the Court, including the four dissenters and the concurring opinion signed by three Justices, rejects Justice Kennedy's balancing test. Regardless, Coeur d'Alene does not make the Ex parte Young exception inapplicable to this case. Our conclusion that this case falls within the exception is supported by the concurring

opinion's appraisal of Ex parte Young: "[A] Young suit is available where a plaintiff alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective." Id. at 2046 (O'Connor, J., concurring) (emphasis omitted). Moreover, the principal opinion reaffirmed the Young principle, noting that "where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar." Id. at 2038 (citation omitted). Neither the State nor the Landowners present factors from this case which would counsel against applying the Ex parte Young exception even under Justice Kennedy's balancing approach.

Justice O'Connor, in the concurring opinion, distinguished Coeur d'Alene from Ex parte Young as follows:

> First, as the Tribe concedes, the suit is the functional equivalent of an action to quiet its title to the bed of Lake Coeur d'Alene. . . . Second, the Tribe does not merely seek to possess land that would otherwise remain subject to state regulation, or to bring the State's regulatory scheme into compliance with federal law. Rather, the Tribe seeks to eliminate altogether the State's regulatory power over the submerged lands at issue—to establish not only that the State has no right to possess the property, but also that the property is not within Idaho's sovereign jurisdiction at all.

Id. at 2043-44 (emphasis added).

We hold that the Eleventh Amendment does not bar any of the claims before us. In Mille Lacs, where the State is a party, the United States has intervened and seeks the same relief as the Bands. The remaining claims in Mille Lacs and the claims in Fond du Lac seek prospective injunctive relief against state officials in their official capacities for continuing violations of the Bands' federal treaty rights. As such, they fall squarely within the Ex parte Young exception to the Eleventh Amendment.

III.


<u>1850 Executive Order</u>


On February 6, 1850, President Zachary Taylor issued the following Executive Order:


> The privileges granted temporarily to the Chippewa Indians of the Mississippi by the Fifth Article of the Treaty made with them on the 29th of July 1837, "of hunting, fishing and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded" by that treaty to the United States . . . are hereby revoked; and all of the said Indians remaining on the lands ceded as aforesaid, are required to remove to their unceded lands.[18]


The district court in <u>Mille Lacs II</u> rejected the defendants' argument that this order validly terminated usufructuary rights reserved by the Bands in the 1837 Treaty.  First, the court held that President Taylor did not have authority to order the Bands to remove, and that the portion of the Executive Order revoking the Bands' usufructuary rights was not severable from the portion of the document ordering removal.  <u>Mille Lacs II</u>, 861 F. Supp. at 824-26.  In the alternative, the court held that even if the Order were backed by the necessary authority or if the revocation portion were severable, the Order did not effect a revocation because the 1837 Treaty did not grant the President

---

[18]In the years in and around the execution of the 1837 Treaty, removal of tribes was the official policy of the United States government.  President Andrew Jackson, one of the most vigorous proponents of the policy, began pushing for removal legislation shortly after his election in 1829.  "After one of the bitterest debates in the history of Congress," the Removal Act was enacted into law on May 28, 1830.  Grant Foreman, <u>Indian Removal</u> 21 (1932).  The Act authorized the President to enter into treaties exchanging lands for compensation and removal.  Many removal treaties (not including the 1837 Treaty at issue here) followed.

unfettered discretion to revoke the usufructuary rights it preserved. Id. at 826-27. The Seventh Circuit had used this approach in Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341 (7th Cir. 1983) (LCO), where it held that the 1837 Treaty conferred upon the President discretion to revoke the usufructuary rights only if the Bands misbehaved. See id. at 357 (interpreting the 1837 Treaty and a separate treaty signed in 1842 to allow revocation of usufructuary rights "only if the Indians were instrumental in causing disturbances with white settlers").[19]

Again in the alternative, the district court held that the entire 1850 Order was unlawful because it violated the United States' duty to act in good faith in its dealings with Indians. Mille Lacs II, 861 F. Supp. at 826-27. Finally, the court determined that even if the 1850 Order were valid and gave the President unfettered discretion, it was repealed by implication because it was never enforced. Id. at 829-30.

The State, the Counties, and the Landowners argue that the district court erred in each of these holdings. They advocate that the Executive Order is valid because the 1837 Treaty gave the President unfettered discretion to revoke the Bands' rights.

_____

[19]In the LCO litigation, the Lac Courte Oreilles Band of Chippewa Indians, which signed the 1837 Treaty, brought suit against the State of Wisconsin and state officials seeking a declaratory judgment that it retained usufructuary rights under the 1837 Treaty and a separate 1842 Treaty. Id. at 343-44. The court held that the rights continue to exist. The scope of the LCO Band's rights has been the subject of continued litigation in federal district court and the Seventh Circuit. See, e.g., Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin, 760 F.2d 177 (7th Cir. 1985) (LCO II); 653 F. Supp. 1420 (W.D. Wis. 1987) (LCO III), 668 F. Supp. 1223 (W.D. Wis. 1988) (LCO IV); 686 F. Supp. 226 (W.D. Wis. 1988) (LCO V); 707 F. Supp. 1034 (W.D. Wis. 1989) (LCO VI); 740 F. Supp. 1400 (W.D. Wis. 1990) (LCO VII); 775 F. Supp. 321 (W.D. Wis. 1991) (LCO VIII); see also Kenneth D. Nelson, Comment, Wisconsin, Walleye, and the Supreme Law of the Land: An Overview of the Chippewa Indian Treaty Rights Dispute in Northern Wisconsin, 11 Hamline J. Pub. L. & Pol'y 381 (1990).

Before we can analyze the 1837 Treaty and the scope of the President's discretion, it is necessary to determine whether President Taylor had the power to issue the 1850 Executive Order. [20]

The rule to be followed in examining executive orders is that "[t]he President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." Youngstown, 343 U.S. at 585. An executive order without congressional or constitutional authority is unconstitutional. Id. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Id. at 637 (Jackson, J., concurring), adopted in Dames & Moore v. Regan, 453 U.S. 654, 669 (1981). The Bands argue that Congress required Indian consent as a prerequisite to removal, that it was not present here, and that the Order was therefore against congressional will and the dictates of Youngstown.

The 1830 Removal Act authorized the President to convey lands west of the Mississippi to "such tribes or nations of Indians as may choose to exchange the lands where they now reside, and remove there." 1830 Removal Act, ch. 148, 4 Stat. 411 (emphasis added). Though President Jackson advocated an aggressive policy, including possible use of force to achieve Indian removal, it is clear the Removal Act was "entirely permissive." Wilcomb E. Washburn, 3 The American Indian and the United States: A Documentary History 2169 (1973).

---

[20]The Counties have argued that judicial review of the 1850 Order is barred by the political question doctrine. We find this argument to be foreclosed by Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952), which sets out the standards by which courts review executive orders. In addition, review of the 1850 Order does not fall within any of the categories of nonjusticiable political questions set out in Baker v. Carr, 369 U.S. 186, 217 (1962).

The requirement of Indian consent is easily drawn from the language of the statute. It is buttressed, however, by the statements and actions of congresses and presidents in and after 1830. For example, President Jackson, in his 1829 State of the Union Address, proffered a removal policy and urged that it "should be voluntary, for it would be as cruel as unjust to compel the aborigines to abandon the graves of their fathers and seek a home in a distant land." 1 The State of the Union Messages of the Presidents, 1790-1966, at 310 (Fred L. Israel ed., 1966). In his 1835 State of the Union Address, President Jackson advocated further Indian removal "as fast as their consent can be obtained." Id. at 438, quoted in Mille Lacs II, 861 F. Supp. at 824. Indian consent is also exemplified by the many treaties between the United States and various Indian tribes made after 1830 where removal was negotiated. See Mille Lacs II, 861 F. Supp. at 794 n.7 (listing four such treaties). In 1837, Congress passed an appropriations act specifically to fund the negotiations that led to the 1837 Treaty and others like it. Act of March 3, 1837, ch. 31, 5 Stat. 158. If removal could have been effected through a simple executive order, the difficult process of treaty negotiation would have been unnecessary. The Removal Act did not authorize the President to achieve removal through unilateral means; rather, it "authorized the President to negotiate with selected tribes and to induce them, if possible, to exchange their eastern and southern homelands for substitute reserves lying across the Mississippi . . . ." John W. Ragsdale, Jr., Indian Reservations and the Preservation of Tribal Culture, 59 U.M.K.C. L. Rev. 503, 509 (1991) (emphasis added).

The defendants do not cite to any evidence indicating that the President was authorized to remove the Bands without their consent. The State argued below that the Executive Order was valid because "[b]y the 1830s, the policy of both Congress and the President was clear: to remove the Indians to locations west of the Mississippi, by

treaty if possible, by force if necessary."[21]  However, such unilateral and unlawful action cannot control the clear meaning and intent of the Treaty.

It is clear to us that the Bands in this litigation did not give consent for removal. Defendants do not point to a single document indicating that the 1837 treaty negotiations included discussion of removal.[22]  In 1837, before  negotiations began, Commissioner of Indian Affairs Carey A. Harris sent a letter to Wisconsin Territorial Governor Henry Dodge instructing him on the object of the treaty, which was to "procure from [the] Indians a tract [of land] . . . valuable for its pine woods which cover it."  Letter from Commissioner of Indian Affairs Carey A. Harris to Henry Dodge

---

[21]The State is partially correct.  Scholars have noted that the law of voluntary removal was not always faithfully followed.  See, e.g., Jill Norgren, Protection of What Rights They Have: Original Principles of Federal Indian Law, 64 N.D. L. Rev. 73, 98 (1988) (noting that the "Removal Act articulated a voluntary process of removal to be agreed upon through a process of law," but that the reality of removal was "something quite the contrary"); Siegfried Wiessner, American Indian Treaties and Modern International Law, 7 St. Thomas L. Rev. 567, 578-79 (1995) ("Generally speaking, treaties of removal appear to often have been imposed by force or fraud, tainted by corruption or lack of authority by Indian representatives."); see also Carol Chomsky, The United States-Dakota War Trials: A Study in Military Injustice, 43 Stan. L. Rev. 13, 38 n.150 (1990) (observing that a removal act passed in 1863 "was the first time the United States had chosen to remove Indians unilaterally by statute, without even the semblance of agreement by treaty").

[22]Justice Jackson's three categories of presidential authority set forth in his concurring opinion in Youngstown indicate that where, as here, an executive order contravenes congressional will, the order can stand if the President can draw on his constitutional powers.  Youngstown, 343 U.S. at 637 (Jackson, J., concurring); see also Regan, 453 U.S. at 668-69 (adopting Justice Jackson's categories as "analytically useful").  The Constitution does not help President Taylor here, however, because it confers upon Congress, not the President, authority over Indian affairs.  U.S. Const. art II, § 2, cl. 2 (conferring treaty power to the President but only with the advice and consent of the Senate); id. at art. I, § 8, cl. 3 (Indian commerce clause); see also LCO, 700 F.2d at 361 n.14.

and General W. R. Smith (May 13, 1837). As the district court noted, "The letter did not contain any reference to the removal of the Chippewa, the 1830 Removal Act, or the 1837 appropriations act." Mille Lacs II, 861 F. Supp. at 794. The district court concluded, "Neither Dodge nor the Chippewa intended or understood that any provision of the 1837 Treaty was to provide for removal from the ceded territory." Id. at 798. Given the evidence, most prominently the treaty itself, that the Bands did not approve removal, we cannot conclude that the finding that the Bands did not consent to removal is clearly erroneous.[23]

If Congress required consent for removal, and the Bands did not consent, then President Taylor had no authority for his 1850 Executive Order of removal. This conclusion does not, however, end our inquiry into the matter of the Executive Order. Defendants argue that the portion of the Order extinguishing the 1837 usufructuary rights is separate and severable from the portion of the Order requiring removal.

The test for whether a valid portion of an otherwise unconstitutional statute can be severed also applies to executive orders. Matter of Reyes, 910 F.2d 611, 613 (9th Cir. 1990). In the early case of Champlin Rfg. Co. v. Commission, 286 U.S. 210, 234 (1932), the Court established its test for severability:

> The unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

___

[23]Neither did the Bands consent to removal after the 1837 Treaty was signed. The defendants do not point to any conduct indicating as much, nor can we find any in the record.

See also New York v. United States, 505 U.S. 144, 186 (1992) (using this test); Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684 (1987) (same).

On its face, the Order contains two provisions that seem separate—one ordering revocation of treaty rights, and one ordering removal.  However, the test for severability requires us to look at more than the text of the Order.   As is the case with a court's construction of statutory law, the bottom line in assessing severability turns on the intent of the drafter, in this case President Taylor, and the purpose of the text, in this case the Executive Order.  See EEOC v. CBS, Inc., 743 F.2d 969, 971 (2d Cir. 1984) ("Whether or not we should sever an unconstitutional provision from the remainder of the statute in which it appears is primarily an issue of legislative intent."); Scheinberg v. Smith, 659 F.2d 476, 481 (5th Cir. 1981) ("[T]he question is . . . whether, at the time the statute was enacted, the legislature would have passed it absent the constitutionally objectionable provision."), overruled on other grounds by Planned Parenthood v. Casey, 505 U.S. 833 (1992). The task before us, therefore, is to determine whether President Taylor would have issued an executive order revoking the Bands' treaty rights without also ordering removal.  The district court found that the revocation portion of the Order was included in order "to encourage  removal." Mille Lacs II, 861 F. Supp. at 826.  While the court determined that this observation argues against severability, the observation could cut the other way.  A strong argument could be made (although it is not) that the President would have issued a revocation order without the removal provision, because it would have "encouraged" Bands to remove from the ceded territory without actually ordering them to do so.  If the Bands were denied their rights to hunt, fish, and gather, they would be deprived of their sustenance to exist on the ceded lands, and thus would be forced to remove.   As such, a revocation order standing alone would have allowed the President to attempt to do indirectly what he could not do directly.

Notwithstanding these arguments, on the basis of the record before us, we agree with the district court that the revocation portion of the Order cannot be severed from

its companion provision. The purpose of the Order was to mandate removal, and this purpose was integral to the entire Order. See Zbaraz v. Hartigan, 763 F.2d 1532, 1545 (7th Cir. 1985) ("Severance is improper if the unconstitutional provision is an integral part of the statutory enactment viewed in its entirety.") (internal quotation omitted), aff'd by an equally divided court, 484 U.S. 171 (1986). Other than our above-stated conjecture, there is no evidence that revocation of usufructuary rights would have been made independently of the removal mandate. We may envision a scenario where this indirect method of removal could have been followed, but we have in the record no statement by anyone indicating such a plan had ever been considered, much less employed.[24] All of the historical evidence surrounding the Order relates to removal. Without evidence that the scenario we have outlined had even been contemplated, we

---

[24]Indeed, even the direct order of removal and the corresponding revocation of usufructary rights were never implemented. On August 23, 1851, the Acting Commissioner of Indian Affairs wrote to the Secretary of the Interior and recommended abandoning the removal policy and modifying the Executive Order. Thereafter, Commissioner of Indian Affairs Luke Lea ordered suspension of the Order. The new Commissioner of Indian Affairs, George Manypenny, adopted this policy of abandoning removal in his 1854 report. When President Franklin Pierce took office in 1853, his administration "replaced the old removal policy with a policy of creating reservations for the Chippewa on lands ceded in earlier treaties." Mille Lacs II, 861 F. Supp. at 808. In 1854 and 1855, the government negotiated treaties which followed this new policy creating Chippewa reservations still in place today. See infra Parts IV, V (discussing the 1854 and 1855 Treaties).

As to the revocation order, Minnesota Territorial Governor Willis Gorman wrote to Commissioner Manypenny in 1855 regarding a dispute over a dam, and stated that the Bands retained hunting and fishing rights in the area of the dam. See id. at 810. Annuity payments made after the 1850 Order included equipment for hunting and trapping. See id. at 808 (listing lead, shot, powder, guns, and traps as provisions paid to the Bands). The district court found that "[g]overnment policy between 1851 and 1860 indicates that the government no longer expected the Chippewa to remove and that it expected the Chippewa to continue to hunt, fish, and gather on their ceded lands with the assistance of goods provided by the government." Id.

cannot sever the revocation portion of the Order and hold that it is valid standing alone. See Scheinberg, 659 F.2d at 482 ("[W]e cannot judicially sever a portion of an enactment on the authority of a wholly speculative, and insupportable, interpretation of legislative intent."). We hold that the entire 1850 Executive Order is invalid because it was issued without presidential authority.[25]

IV.

1854 Treaty

By 1854, Congress began to pursue a reservation policy to replace its failing removal policy. Commissioner Manypenny indicated in his 1854 Annual Report that reservations should be established for the Chippewa still living in the lands ceded by the 1837 and 1842 Treaties. An authorization act for this purpose was debated in May 1854, but it failed to pass the Senate. Nonetheless, negotiations went forward, and a treaty resulted. Treaty with the Chippewas, Sept. 30, 1854, 10 Stat. 1109. The Wisconsin Bands and the Fond du Lac Band, but not the Mille Lacs Band, were signatories to the Treaty, which created reservations within the lands ceded in the 1837 and 1842 Treaties in exchange for cession of title to various other tracts of land. The Landowners and the State argued below that the 1854 Treaty, through the creation of reservations, extinguished the 1837 Treaty rights of the Wisconsin Bands. This argument does not apply to the Mille Lacs Band, because it was not a signatory to the

---

[25]As we noted previously, the defendants challenge each of the district court's alternative rulings on this issue. Our holding as to the validity of the Order, however, obviates any need to consider the district court's alternative rulings and the defendants' remaining arguments. We therefore decline to discuss the misbehavior standard read into the 1837 Treaty by the LCO and Mille Lacs II courts, the good faith doctrine which the district court held was violated by the United States in issuing the 1850 Order, and the alleged repeal by implication.

Treaty, nor to the Fond du Lac Band, because defendants have not pursued this argument against that Band.[26] The district court rejected the State's and the Landowners' arguments and held that the 1854 Treaty did not extinguish the usufructuary rights reserved under the 1837 Treaty. Mille Lacs III, slip op. at 33. On appeal, the Landowners urge us to reverse the district court.[27]

The Landowners rely on United States v. Santa Fe Pac. R.R., 314 U.S. 339 (1941), where the Supreme Court determined that creation of a reservation by the United States and acceptance of it by the Walapai Indians "amounted to a relinquishment of any tribal claims to lands which they might have had outside that reservation." Id. at 357-58 (footnote omitted). The Court made it clear that mere establishment of a reservation does not automatically extinguish rights to lands outside the reservation, but it determined that the facts and circumstances of the case indicated extinguishment of title. In 1865, Congress had established a reservation for the Walapai Indians in an effort to induce them to abandon their ancestral lands. Id. at 351-53. The Tribe did not accept the reservation at that time, and the Court determined that its rights to the land were not extinguished by the mere passage of the act creating the reservation. Id. at 353-54. In 1881, however, the Tribe accepted the reservation. The Court determined that "[i]n view of this historical setting, it cannot now be fairly implied that tribal rights of the Walapais in lands outside the reservation were preserved." Id. at 358.

---

[26]The 1854 Treaty also reserved to various Bands, including the Fond du Lac Band, a right to hunt and fish on the newly ceded lands. Claims for these usufructuary rights were brought by the Fond du Lac Band, but are not a part of this consolidated case. See Fond du Lac, slip op. at 22-34 (determining that the 1854 Treaty granted usufructuary rights in Minnesota to the Fond du Lac Band, but declining to decide the scope of those rights until Phase II of the case).

[27]The State has not addressed the 1854 Treaty in this court.

-41-

The district court distinguished Santa Fe: "Not only is the historical context completely different, the Court's analysis was based upon aboriginal title whereas in this case, the usufructuary rights at issue have been found to be treaty rights." Mille Lacs III, slip op. at 28. We agree. The circumstances involved in Santa Fe, where the argument was over aboriginal title rather than usufructuary rights reserved by treaty, are not present here.[28] See LCO, 700 F.2d at 351-52 (explaining the legally significant differences between aboriginal title and treaty-recognized rights). Most importantly, however, the evidence is overwhelming that neither party intended the 1854 Treaty to disturb usufructuary rights. The Treaty established reservations and ceded lands different from the lands ceded in the 1837 Treaty, and explicitly preserved usufructuary rights on the newly ceded lands. See id. at 364 ("[T]he inclusion in the 1854 treaty of a reservation of usufructuary rights by the Minnesota Chippewas suggests, in our view, that the LCO band believed their usufructuary rights [reserved in the 1837 and 1842 Treaties] to be secure and unaffected by the treaty."); Mille Lacs II, 861 F. Supp. at 815 (concluding that the government did not intend to extinguish usufructuary rights in a different treaty with the Chippewa in part because the Treaty does not contain references to the rights, and "[w]hen the United States extinguished reserved rights of fishing in other treaties, it included explicit language ending those rights and providing monetary compensation").

V.

1855 Treaty

_____

[28]We note also the distinction in the law between usufructuary rights, at issue here, and title or occupancy, at issue in Santa Fe. See LCO, 700 F.2d at 352 ("[T]reaty-recognized rights of use depend neither on title nor right of permanent occupancy.").

In December 1854, Congress passed the previously rejected bill establishing authority for treaty negotiations. The bill provided retroactive authority for the 1854 Treaty, and authority to negotiate a follow-up treaty.  On January 4, 1855, Commissioner Manypenny directed Governor Gorman to begin the negotiation process for a new treaty with the Chippewa "respecting their claim to lands in Minnesota." Mille Lacs II, 861 F. Supp. at 812 (citation omitted).  The new treaty was negotiated from February 12 to February 22, 1855.  It was signed by the Mississippi, Pillager, and Lake Winnibigoshish Bands of Chippewa, a group which includes the Mille Lacs Band but not the Fond du Lac Band or the Wisconsin Bands.  Article 1 of the Treaty ceded a ten million acre tract of land located north and northwest of the 1837 ceded territory. Treaty with the Chippewas, Feb. 22, 1855, art. 1, 10 Stat. 1165.  Article 1 also states, "And the said Indians do further fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they may now have in, and to any other lands in the Territory of Minnesota or elsewhere."  The Treaty established the Mille Lacs reservation in the 1837 ceded territory, but it does not mention hunting, fishing, and gathering rights at all, and the usufructuary rights in the 1837 Treaty were never mentioned in treaty negotiations. Mille Lacs II, 861 F. Supp. at 815.

The State, the Counties and the Landowners contend that the language in the 1855 Treaty conveying "all right, title, and interest, . . . in, and to any other lands in the Territory of Minnesota or elsewhere" extinguished the Mille Lacs Band's usufructuary rights on off-reservation lands.  The district court in Mille Lacs II, after "a careful examination of the historical record established at trial," made the following findings: (1) the government did not intend for the 1855 Treaty to extinguish the usufructuary rights reserved in the 1837 Treaty, 861 F. Supp. at 815-16, 821; (2) the Chippewa did not intend to give up their 1837 Treaty privilege and they did not understand the 1855 Treaty to have that effect, id. at 816-18; and (3) both the Band and the United States believed that the 1837 Treaty rights continued to exist after the 1855 Treaty was signed, id. at 818-821.

-44-

The 1855 Treaty is void of explicit language extinguishing the Band's usufructuary rights, nor does it mention the 1837 Treaty. In analyzing the broad language of the 1855 Treaty, we must view it in its historical context to determine whether the parties meant it to revoke usufructuary rights. The circumstances surrounding the Treaty do not indicate that either side intended or understood the treaty to work such a revocation. We look first at the interpretation understood by the Bands. See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 676 (1979) (A "treaty must . . . be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians."). The historical evidence demonstrates that the Bands signing the 1855 Treaty did not intend to give up their usufructuary rights. During the negotiations, a Chippewa representative repeatedly indicated that he understood that the purpose of the Treaty was to purchase land. Mille Lacs II, 861 F. Supp. at 813. Chippewa representatives also indicated during negotiations that they would continue to hunt, fish, and gather after the Treaty was negotiated. Id. at 814. Indeed, the district court found that in the years after the Treaty was signed, the Chippewa complained to federal officials that state enforcement of game regulations violated their rights under the 1837 Treaty. Id. at 831-32.

As to the United States, we note first that the United States knew how to draft a treaty to revoke usufructuary rights, and did not do so in this case. See, e.g., Treaty with the Middle Oregons, Nov. 15, 1865, art. I, 14 Stat. 751 ("[T]he right to take fish, erect houses, hunt game, gather roots and berries, and pasture animals upon lands without the reservation set apart by the treaty aforesaid—[is] hereby relinquished."); Treaty with Chippewas of Sault St. Marie, Aug. 2, 1855, art. I, 11 Stat. 631 ("The said Chippewa Indians surrender to the United States the right of fishing at the falls of St. Mary's, and of encampment, convenient to the fishing-ground, secured to them by the treaty of June 16, 1820."); Treaty with the Winnebago Indians, Oct. 13, 1846, art. IV, 9 Stat. 878 (paying "forty thousand dollars for release of hunting privileges, on the lands adjacent to their present home"); Treaty with the Sacs and Foxes, Oct. 21, 1837,

art. I, 7 Stat. 543 (revoking "the right to locate, for hunting or other purposes, on the land ceded in the first article of the treaty of July 15th 1830"). In addition, the authorization act for the 1855 Treaty directed the President to negotiate a treaty with the Chippewa "for the extinguishment of their title to all the lands owned and claimed by them in the Territory of Minnesota and State of Wisconsin." The United States was clearly concerned about extinguishment of <u>title</u>, not usufructuary rights.

The district court's factual findings regarding the intention of the parties to the 1855 Treaty are well supported, and we cannot conclude they are clearly erroneous. Given the absence of any mention of the 1837 Treaty or its usufructuary rights in the 1855 Treaty or its negotiation process, and the lack of evidence that the parties intended to extinguish these rights, we conclude that the 1855 Treaty did not revoke the 1837 Treaty's usufructuary rights.[29]

Defendants argue, however, that <u>Oregon Dept. of Fish & Wildlife v. Klamath Indian Tribe</u>, 473 U.S. 753 (1985) compels a different result. The Klamath Indian Tribe (the Tribe) had signed an 1864 Treaty ceding lands in Oregon to the United States. The Treaty also created a reservation for the Tribe and secured to them "the exclusive right of taking fish in the streams and lakes, included in said reservation." <u>Id.</u> at 755. The Treaty did not expressly reserve Indian rights to hunt or fish <u>outside</u> the reservation. A large portion of the intended reservation was excluded as a result of survey error.

In 1901, the Tribe agreed to "cede, surrender, grant, and convey to the United States all their claim, right, title and interest in and to" the land mistakenly excluded

---

[29]The Landowners argue that the usufructuary rights were not mentioned because "the 1850 Order had already been issued revoking the privilege, negating any need to reference it in 1855." If anything, this point indicates that the parties did <u>not</u> intend for the 1855 Treaty to revoke usufructuary rights that were, in their minds, nonexistent.

from the 1864 Treaty.  Id. at 760.  The 1901 Agreement did not contain any reference to hunting and fishing rights.  When the State of Oregon enforced its conservation laws against the Tribe on the lands ceded in the 1901 Agreement, the Tribe brought suit. The Supreme Court interpreted the 1864 Treaty and the 1901 Agreement to extinguish hunting and fishing rights on ceded lands.  Id. at 770.  In coming to its decision, the Klamath Court considered that the 1864 Treaty established an exclusive right to hunt and fish on the reservation.  Thus the hunting and fishing rights "did not exist independently of the reservation itself" and were ceded in 1901 when the reservation was diminished.  Id. at 768.

The 1864 Treaty rights in Klamath were exclusive and on-reservation rights, and thus logically extinguished with a relinquishment of a portion of the reservation.  The rights at issue in this litigation are non-exclusive and off-reservation rights, reserved in a treaty not mentioned in the 1855 Treaty or its negotiations.  The situations are not analogous and do not compel the same outcome.  We hold that Klamath does not require reversal, and affirm the district court's holding that the 1855 Treaty did not extinguish the usufructuary rights that are the subject of this litigation.

## VI.

### Preclusive Effect of Prior Litigation

#### A.  Court of Claims (*Mole Lake*) Litigation

In 1940, several Wisconsin Chippewa Bands, including some of the Bands which are plaintiffs in this action, brought a claim against the United States in the Court of Claims.  The action was brought pursuant to an ad hoc jurisdictional statute waiving federal sovereign immunity, which was designed to enable Indian claims for loss of

aboriginal title.[30]  Mole Lake Band v. United States, 126 Ct. Cl. 596, 598 (Ct. Cl. 1953); Act of August 30, 1935, Pub. L. No. 74-410, 49 Stat. 1049.  The Fond du Lac Band intervened in the Mole Lake litigation on August 30, 1940.  Mole Lake, 126 Ct. Cl. at 598-99.  Neither the Mille Lacs Band nor the State was a party to the case.

The original Mole Lake petition set forth multiple claims under various treaties, mostly seeking compensation for lands ceded under the treaties.  A portion of the petition included claims contending that federal officials had violated the plaintiffs' usufructuary rights under the treaties.[31]  Severed from the original petition were causes of action relating to certain tracts of swamp land and causes of action relating to "public school sections" of land.  The swamp land claims were resolved in Mole Lake Band v. United States, 139 F. Supp. 938 (Ct. Cl. 1956).  The school land claims were dismissed in Mole Lake Band v. United States, 82 F. Supp. 342 (Ct. Cl. 1949).  The remainder of the petition was narrowed to include only seven claims.  Mole Lake, 126 Ct. Cl. at 597.  The Court of Claims stated that the reason for the narrowing of claims was the severance of the swamp land and school land claims, the "institution of suits before the Indian Claims Commission," and the "abandonment of some of the claims not severed out of the petition."  Id.  None of the swamp land claims, the school land

---

[30]The Mole Lake litigation was against the United States.  The Bands could not have joined the officers of the State of Minnesota, its counties, or the Landowners in the Court of Claims litigation.  The Court of Claims had exclusive jurisdiction over claims against the United States.  We note that the United States supports the Bands' argument that the Mole Lake litigation does not serve to bar the present litigation under the rules of issue preclusion.

[31]For example, the petition alleged that the United States destroyed "the natural habitat of fish, game and fur bearing animals," and thus "deprived plaintiffs of a great part of the consideration" due them for cessions of land.  It also alleged that the United States "failed to protect" the plaintiffs' rights to "unrestricted use [of ceded lands] for hunting, fishing, trapping and camping."

claims, or the seven remaining claims included allegations of the denial of usufructuary rights.

The defendants argued to the district court that the Mole Lake litigation collaterally estops the Bands' claims in this action. In order for collateral estoppel (issue preclusion) to bar litigation of an issue,

> (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been litigated in the prior action; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.

Stoebner v. Parry, 91 F.3d 1091, 1094 (8th Cir. 1996). In addition, the estopped party must be a party or in privity with a party to the prior litigation. Wellons, Inc. v. T.E. Ibberson Co., 869 F.2d 1166, 1168 (8th Cir. 1989).

The district court in Mille Lacs I found that although the Mille Lacs Band was a signatory to the 1837 Treaty, it was not in privity with the Bands in the Mole Lake litigation.[32] The court then found in the alternative that Mole Lake did not adjudicate whether the Bands retained their usufructuary rights under the 1837 Treaty.[33]

In Mille Lacs III, the district court considered whether issue preclusion barred the Wisconsin Bands' claims. In determining that the Wisconsin Bands were not barred by the issues tried in Mole Lake, the court adhered to the earlier alternate ruling

---

[32]The Landowners argued that the Mille Lacs Band was in privity with the Bands in the Mole Lake litigation by way of membership in a common tribe.

[33]The State's brief is not helpful in this regard since it merges the Mole Lake litigation with the later Indian Claims Commission claims. As our discussion indicates, these are separate questions requiring separate resolution.

in Mille Lacs I that the issues were not identical and therefore could not serve as a bar under principles of collateral estoppel. Mille Lacs III, slip op. at 25. The district court also considered collateral estoppel in Fond du Lac, and determined that the Fond du Lac Band was not given a full and fair opportunity to litigate the issue of usufructuary rights in Mole Lake. The court concluded, "There is no evidence that a resolution of the usufructuary rights issue was necessary to the final judgment rendered by the Court of Claims in Mole Lake." Fond du Lac, slip op. at 16. Thus, collateral estoppel did not bar the Fond du Lac Band's claims. Id.[34]

On appeal, the Landowners, the Counties, and the State challenge all three of these decisions. They argue that the original petition in the Mole Lake proceeding collaterally estops the Bands from bringing their claims in this litigation. A close review of the petition refutes their argument. While the parties dispute whether the usufructuary rights claims in the petition were later litigated, they overlook the fact that the petition does not include any claims under the 1837 Treaty that underlies the Bands' claims here. The petition lists twenty-six treaties which form the basis of the plaintiffs' claims in Mole Lake. The list does not include the July 29, 1837 Treaty at issue in this case. We can end our collateral estoppel analysis as to the original petition here. Even if the petition can be read to include usufructuary rights claims, it cannot collaterally estop the Bands from later bringing claims for usufructuary rights under a different treaty. This is what they have done here, and we hold that they are not barred by the original Mole Lake petition from doing so.

We come to the same conclusion when we examine the swamp land cause of action[35]. Under the elements of collateral estoppel set out above, the issue to be barred

---

[34]Unlike the Mille Lacs Band, the Fond du Lac Band had intervened in the Mole Lake litigation, and thus privity was not an issue.

[35]The two remaining decisions of the Court of Claims mention neither the 1837 Treaty nor the 1850 Executive Order. See Mole Lake, 126 Ct. Cl. 596; Mole Lake, 82

must have been actually litigated and necessary to the final judgment in the prior action. Stoebner, 91 F.3d at 1094. The cause of action in the swamp land proceeding was for damages for the value of land and timber within reservations established in the 1854 Treaty discussed in this opinion. Plaintiffs did not seek relief, as they do here, for the denial of usufructuary rights reserved in the 1837 Treaty. Mole Lake, 139 F. Supp. at 939-40; see also United States v. Gurley, 43 F.3d 1188, 1196 (8th Cir. 1994) ("In the final analysis the test would seem to be whether the wrong for which redress is sought is the same in both actions.") (quotations and citations omitted; emphasis by the Gurley court) cert. denied, 116 S.Ct. 73 (1995).

Though the swamp land decision discussed the 1850 Executive Order, it did not decide any issues relating to it, because the court had no reason to do so. See Mole Lake, 139 F. Supp. at 939-40; see also LCO, 700 F.2d at 360 ("Although the judge discussed the Removal Order in the context of the historical events which culminated in the grant of the reservations lands in 1854 . . . he neither expressed nor had reason to consider the validity of the Removal Order.") (emphasis in original). The general discussion of the Executive Order in the swamp land decision cannot support the conclusion that the Order presented an issue necessary to that decision. We hold that the usufructuary rights issue was not actually litigated in the swamp land proceeding. The elements of collateral estoppel are not met, and the doctrine does not work to bar the Bands' claims.[36]

---

F. Supp. 342.

[36]Res judicata (claim preclusion) bars a subsequent suit between the same parties or their privies based on the same cause of action. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979). The district court noted in Mille Lacs I that the State abandoned its res judicata defense because in this case there are different parties than were in the Mole Lake and Indian Claims Commission proceedings.

The Landowners also urge this court to apply judicial estoppel to various claims made by the Bands in the <u>Mole Lake</u> proceedings.[37]   The Bands argue that the Landowners did not assert this claim in the district court, and that we should therefore reject it here.  None of the district court opinions includes a discussion of judicial estoppel, nor can we find the argument in the record.  Thus, the Landowners are precluded from raising it on appeal.  <u>See</u> <u>Bursch v. Beardsley & Piper</u>, 971 F.2d 108, 113 (8th Cir. 1992) (refusing to discuss an argument not raised before the district court).

B.  <u>Indian Claims Commission Litigation</u>

In 1946, Congress created the Indian Claims Commission (ICC) to hear tribal claims arising under the Constitution, laws, treaties, or executive orders, and accruing before August 13, 1946.  Indian Claims Commission Act of 1946, ch. 959, 60 Stat. 1049 (formerly codified at 25 U.S.C. § 70(a)).  In January 1948, many Minnesota Bands of Chippewa, including the Fond du Lac Band but not, initially, the Mille Lacs Band, brought claims for compensation for lands ceded under the 1837, 1842, 1854, and 1855 Treaties discussed earlier in this opinion.  The original petition before the ICC stated that usufructuary rights were "a material consideration" for ceding the lands. It also alleged, "The United States has deprived the plaintiffs and other Indians of the right to hunt and fish upon the ceded lands and upon the land retained by them . . . ." This original petition was assigned to the ICC's Docket 18, which was then severed into three parts: Docket 18-C included claims under the 1837 Treaty and additional treaties; Docket 18-B included claims under the 1855 Treaty; and Docket 18-U included claims under the 1854 Treaty.

---

[37]For example, in their brief to the Court of Claims on the swamp land claims, the Wisconsin Bands involved in the litigation stated, "The right of occupancy provided in the Treaties of 1837 and '42 was terminated by an executive order of February 6, 1850."  The Landowners argue on appeal that the doctrines of judicial estoppel and collateral estoppel bar the Bands from arguing otherwise here.

On August 9, 1949, the plaintiffs drew up a new petition for Docket 18-C. The complaint alleged that "there was reserved for the various parties to said treaties, and the defendant [the United States] undertook to conserve the same, hunting, fishing and other rights in various lands, all of which were a material consideration for the ceding thereof." In the United States' answer to the complaint, it admitted that the treaties reserved hunting and fishing rights, but denied that it had violated the rights in any way.

On October 23, 1957, the ICC issued an order severing Docket 18-C further, separating causes of action based on treaties other than the 1837 Treaty. The ICC then required the plaintiffs to file a new Docket 18-C complaint, asserting only their claims under the 1837 Treaty. The order provided that the amended complaint "shall be considered as having been filed on August 9, 1949, and shall take the place of said original petition." On August 5, 1959, the Mille Lacs Band joined the existing plaintiffs to file an amended complaint pursuant to the court's order. This amended complaint alleged that the amount paid by the United States for the land ceded in the 1837 Treaty was "grossly inadequate and unconscionable." The complaint did not refer to any hunting, fishing, or gathering rights.

The ICC adjudication of the claims in Docket 18-C spanned several decades and resulted in three different decisions, found at 19 Ind. Cl. Comm. 514 (1968), 26 Ind. Cl. Comm. 22 (1971), and 32 Ind. Cl. Comm. 192 (1973). The ICC responded to the Bands' claims for compensation by valuing the land ceded in the 1837 Treaty for its "highest and most valuable uses," which, the Bands' experts determined, were pine timber and agriculture. The ICC found that the fair market value of the land at the time of the Treaty was $9,875,000. 26 Ind. Cl. Comm. at 59. It subtracted the $847,440 that the United States paid the Bands for the land and awarded the Bands $9,027,560 in full satisfaction of their claims. 32 Ind. Cl. Comm. at 200. The ICC did not, in any of its opinions, mention the hunting, fishing, and gathering rights reserved under Article V of the 1837 Treaty.

In <u>Mille Lacs I</u>, the district court analyzed the ICC proceedings under the collateral estoppel doctrine, examined the pleadings and the record of the ICC litigation, and determined that the issue of usufructuary rights was not actually litigated and necessary to the outcome of the case. <u>Mille Lacs I</u>, 853 F. Supp. at 1137. The court concluded that the ICC's award of compensation for the lands based on their highest and best valuation "does not indicate that the ICC concluded that the usufructuary rights had been extinguished." <u>Id.</u> Therefore, it rejected the defendants' argument that the Mille Lacs Band was collaterally estopped by the ICC litigation.

As to the Wisconsin Bands, the court followed the <u>Mille Lacs I</u> ruling, and held that the Bands "are not precluded under the doctrine of collateral estoppel from asserting their claims in this litigation by the prior litigation before the ICC in Docket 18C because the issue of the continued existence of the 1837 privileges were [sic] not litigated." <u>Mille Lacs III</u>, slip op. at 25.

As to the Fond du Lac Band, the court again held that the Band is not collaterally estopped by the ICC litigation. First, it determined that the original Docket 18 petition does not provide a bar, because "[o]nce a pleading has been amended, the old pleading serves no function in the litigation." <u>Fond du Lac</u>, slip op. at 16-17. Second, it concluded that the ICC's valuation of the land for "highest and best use" did not settle the issue of usufructuary rights. <u>Id.</u> at 17. The court distinguished <u>Klamath</u>, which the defendants argued necessitated a contrary conclusion, by noting that the <u>Klamath</u> decision involved a treaty that was silent as to off-reservation hunting and fishing rights, whereas the Treaty here explicitly reserved off-reservation hunting and fishing rights. <u>Fond du Lac</u>, slip op. at 20 n.12.

This second issue is the one on which both the State and the Landowners concentrate on appeal. They argue that the value of usufructuary rights was subsumed in the ICC award, because the award was based on the highest and best use of the

land.[38] This measurement, according to the State and the Landowners, represents the total value of the land. If the measurement was not intended to include usufructuary rights, these parties contend, the ICC would have made a specific deduction from the calculated value of the land for the value of still-existing usufructuary rights. Since it did not, the argument goes, the ICC award includes payment for the 1837 Treaty rights, and they are extinguished, thus collaterally estopping the Bands from bringing their claims here.

The defendants urge that the Supreme Court's decision in Klamath supports their collateral estoppel argument. They contend that Klamath stands for the proposition that an ICC award that is silent as to usufructuary rights automatically subsumes and estops future usufructuary rights claims.

In Klamath, the ICC had awarded in 1969 over four million dollars to the Tribe as additional compensation for the lands ceded by the 1901 Agreement. 473 U.S. at 762. The amount of the award "was based on the estimated value of the land for stock grazing and timber harvesting, which the parties had agreed constituted the 'highest and best uses' for the land." Id. The ICC opinion in Klamath did not mention hunting or fishing rights. Part of the Tribe's argument that its usufructuary rights survived the 1901 Agreement was that the absence of any ICC payment for hunting and fishing rights demonstrated that the parties did not intend for them to be extinguished. Id. at 773. The Supreme Court rejected the Tribe's contention, holding that "had the parties actually intended to preserve independent hunting and fishing rights for the Tribe on the ceded lands, the [ICC] presumably would have computed the value of such rights and

---

[38]To the extent that the State and the Landowners rely on the original ICC petition to provide a bar, we agree with the district court's decision in Fond du Lac that a complaint that has been amended cannot be revived for purposes of res judicata or collateral estoppel. See Fond du Lac, slip op. at 16-17.

explicitly subtracted that amount from the price to be paid for land so encumbered." Id.

The State and the Landowners seize upon this language, asserting that it requires this court to interpret the ICC's silence as to usufructuary rights as extinguishment of those rights. Their argument, however, fails to appreciate crucial distinctions between the treaty here and the treaty involved in Klamath. Here, the 1837 Treaty explicitly reserves off-reservation usufructuary rights. In Klamath, the treaty at issue was silent as to off-reservation usufructuary rights. As the district court herein observed:

> The critical distinction of whether the rights to hunt and fish were reserved in a prior treaty leads to a critical difference in the way the ICC's silence on those rights should be treated. If the rights were reserved in a treaty, the ICC would have had to find that the rights had been extinguished; thus, silence implies no determination as to those rights. If the rights were not reserved, silence would imply that the rights were determined to have been disposed of by the cession of the land. Klamath deals with the latter situation; this case presents the former.

Fond du Lac, slip op. at 20 n.12. The ICC opinions in this case are not cursory. We cannot accept the conclusion that they extinguished an important body of rights bargained for and explicitly reserved in a treaty without any mention of those rights. Cf. Swim v. Bergland, 696 F.2d 712, 718 (9th Cir. 1983) (rejecting the contention that a party could rely, for collateral estoppel purposes, "solely on general language of [ICC] settlement documents to sweep in Article IV grazing rights" where "all specific language in the pertinent documents, including the original petition, refers only to the low compensation paid for lands ceded in Article I").[39]

_____

[39]This conclusion applies equally to the defendants' arguments under Western Shoshone Nat'l Council v. Molini, 951 F.2d 200 (9th Cir. 1991). There, the Ninth Circuit determined that claims for hunting and fishing rights did not survive an ICC extinguishment of title and correlating award, but it emphasized that the treaty at issue

The defendants' argument also fails to appreciate another difference between this case and Klamath. In Klamath, the Supreme Court used the ICC's silence on the issue of hunting and fishing rights as one factor indicating that the 1901 Agreement extinguished hunting and fishing rights on ceded lands. 473 U.S. at 773. The Court concluded, "The absence of specific compensation for the rights at issue is entirely consistent with our interpretation of the 1901 Agreement." Id. at 774. The ICC's silence was used by the Court to buttress its conclusion as to the interpretation of the Tribe's agreement with the United States. To view the ICC's silence in this case to mandate preclusion of hunting and fishing rights claims is to give Klamath an interpretation it simply cannot bear. We therefore hold that the ICC proceedings do not collaterally estop the Bands from bringing usufructuary rights claims here.

VII.

Equal Footing Doctrine

The defendants argue that any rights the Bands acquired under the 1837 Treaty were extinguished upon Minnesota's admission into the Union in 1858.[40] They assert that under the "equal footing doctrine," those rights became void when Minnesota was granted statehood and acquired the sovereign trust and police power over its natural resources. The district court rejected this as a basis for defeating the Bands' usufructuary rights. We affirm.

_____

did not expressly reserve hunting and fishing rights. Id. at 202-03.

[40]The "equal footing" defense was presented below in Fond du Lac and in Mille Lacs with respect to the Wisconsin Bands, but not with respect to the Mille Lacs Band. However, because this is a question of law, fully briefed by the parties and addressed twice by the district court, we think the issue is properly before us as to all of the Bands. See Shannon v. Ford Motor Co., 72 F.3d 678, 684 (8th Cir. 1996).

On May 11, 1858, the thirty-fifth Congress passed legislation admitting the State of Minnesota into the Union. Minnesota was admitted "on an equal footing with the original states in all respects," and there was no reservation or exception made for rights secured to the Bands. An Act for the Admission of the State of Minnesota into the Union, ch. 31, 11 Stat. 285 (1858). The equal footing doctrine, a reflection of Congress' language admitting the states, "requires that all states admitted into the Union after the original thirteen states be admitted on 'equal-footing' with the original states; the newly admitted states must have the same rights and sovereignty at the time of admission as the original states." Crow Tribe of Indians v. Repsis, 73 F.3d 982, 990-91 (10th Cir. 1995) (citations omitted), cert. denied, 116 U.S. 1851 (1996). The basis for the defendants' argument for applying the doctrine herein is an amalgamation of two related points: (1) any rights conferred by the federal government in the 1837 Treaty were extinguished when Minnesota became a state and acquired the same rights and sovereignty reserved under the Tenth Amendment[41] to the original thirteen states, and (2) in the act admitting Minnesota into the Union, Congress' silence regarding the Bands' usufructuary rights constituted an abrogation of those rights.

The defendants argue that the controlling law is found in Ward v. Race Horse, 163 U.S. 504 (1896), and Repsis, 73 F.3d 982. In Ward, the relevant treaty provision secured to the Bannock Indians the "right to hunt on the unoccupied lands of the United States, so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts." 163 U.S. at 507. The Court described this right as "temporary and precarious," noted that the legislation admitting Wyoming into the Union did not reserve any rights for the Indians, and held the right to hunt did not survive Wyoming's statehood. Id. at 515. In Repsis, the Tenth Circuit analyzed an 1868 Treaty with the same relevant language as Ward. Repsis, 73 F.3d

_____

[41]The Tenth Amendment to the Constitution provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

at 987. The Tenth Circuit affirmed the dismissal of the Tribe's action based on rights under the 1868 Treaty, holding that the Supreme Court's interpretation in Ward of the same treaty language controlled and therefore the Tribe's rights were "repealed by the act admitting Wyoming into the Union." Id. at 992 (citing Ward, 163 U.S. at 514). The Tenth Circuit found important the distinction between treaty-based rights which are temporary and those which are continuing:

> [T]he equal-footing doctrine does not prevent the United States from creating a right in a territory which would be binding on the state upon its admission into the Union. However, in order for such a right to be binding on the state, it must be a continuing or perpetual right—a right that is intended at its formation to be continuing against the United States and its grantees, including the state.

Repsis, 73 F.3d at 991.

The State argues that in applying the equal footing doctrine, this court must use a two-part analysis to determine whether the 1837 Treaty rights survived Minnesota's admission into the Union: first, we must decide whether the rights were intended to be "temporary" or "permanent"; second, if the right is temporary, we must decide whether it conflicts with the state's sovereignty. As to the first question, the State asserts that the right is temporary because the phrase "during the pleasure of the President" expressly provides for the potential revocation of the right. Whether or not a misbehavior standard was understood to modify the President's discretion, the State contends that the simple fact that under some scenario the rights could be revoked proves that they were intended to be temporary in nature. As to the second question, the State argues that the rights are irreconcilable with its sovereignty, and therefore were extinguished, because any right to hunt and fish off-reservation in violation of state law conflicts with its right to control the natural resources within its borders.

We reject the application of the equal footing doctrine defense for several reasons. First, the district court noted the language in the 1837 Treaty securing the Bands' usufructuary rights must be distinguished from the "temporary and precarious" rights addressed in <u>Ward</u> and <u>Repsis</u>. <u>Mille Lacs III</u>, slip op. at 22; <u>see also</u> <u>Fond du Lac</u>, slip op. at 31 (analyzing similar usufructuary rights in the 1854 Treaty). The treaties in <u>Ward</u> and <u>Repsis</u> reserved rights on the "unoccupied lands of the United States." The standard of when "unoccupied" lands become "occupied" is certainly vague, and could logically include the granting of sovereignty to a newly formed state. <u>See</u> <u>Fond du Lac</u>, slip op. at 31. Moreover, in <u>Ward</u>, the Court interpreted the treaty rights therein to secure the right to hunt in hunting districts on lands owned by the United States. <u>See</u> <u>Ward</u>, 163 U.S. at 509-10. Therefore, the Court found the rights to be tied to the United States' ownership of the lands. In contrast, the rights secured to the Bands in Article 5 of the 1837 Treaty are in no way tied to ownership, but instead were intended to be continuing rights.[42]

Second, the Bands' usufructuary rights are not irreconcilable with the State's sovereignty. This second part of the two-part analysis poses the important question of whether in our constitutional system of dual sovereignty the rights secured to the Bands in a treaty with the federal government can bind the State. In <u>United States v. Winans</u>, 198 U.S. 371 (1905), the Supreme Court analyzed a treaty which reserved on ceded lands the "right of taking fish at all usual and accustomed places, in common with citizens of the Territory." <u>Id.</u> at 378. The Court rejected the argument that these rights were repealed upon Washington's admission into the Union, concluding:

---

[42]The defendants argue that because the rights could be revoked by the President under some standard, they are similar to the "temporary and precarious" rights analyzed in <u>Ward</u> and <u>Repsis</u>. However, the fact that the rights could be revoked by the President, or abrogated by Congress like any other treaty right, does not deprive them of their "continuing" nature.

The extinguishment of the Indian title, opening the land for settlement and preparing the way for future States, were appropriate to the objects for which the United States held the Territory. And surely it was within the competency of the Nation to secure to the Indians such a remnant of the great rights they possessed as "taking fish at all usual and accustomed places." Nor does it restrain the State unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enables the right to be exercised.

Id. An important part of the Court's analysis was recognition of the fact that the United States had not granted usufructuary rights to the Indians in the territory. "[T]he treaty was not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted." Id. at 381. As such, the United States did not convey to the Indians anything which the State could claim the right to control, but rather the United States secured title to vast areas of land for the benefit of the future state in exchange for the Indians' reservation of usufructuary rights. Cf. United States v. Forty-Three Gallons of Whiskey, 93 U.S. 188, 197-98 (1876) (rejecting the argument that Minnesota's sovereignty is infringed by enforcement of a treaty provision making federal law prohibiting the sale or introduction of liquor applicable to lands ceded in the treaty).

In Tulee v. Washington, 315 U.S. 681 (1942), the Court followed Winans and reconciled similar off-reservation usufructuary rights with the state's regulatory authority. The Court upheld an Indian's right to rely on off-reservation treaty rights that conflict with state law unless the state regulations are necessary for conservation of the resource in question. Id. at 684. We think Winans and Tulee show that usufructuary rights reserved by the Bands on lands ceded to the United States in a treaty are not hopelessly in conflict with Minnesota's regulatory authority.[43] Because

_____

[43]Though the State has stipulated to the applicability of a Conservation Code and Management Plan, the Counties and Landowners argue that the Bands should be

-62-

the federal government clearly had the power to enter into the 1837 Treaty, and because the Bands' rights can be reconciled with the State's regulation of the natural resources within its borders, we conclude that upholding the Bands' usufructuary rights does not offend the State's sovereignty.[44]

---

subject to existing state regulation rather than writing their own. The district court held, "The State may not impose its own regulations if the Band can effectively self-regulate and if tribal regulations are adequate to meet conservation, public health, and public safety needs." Mille Lacs II, 861 F. Supp. at 839. The Supreme Court has consistently rejected arguments that Indian treaties reserve to the Indians no more fishing rights than those enjoyed by non-Indian citizens. Instead, the Court has established a "conservation necessity" standard, under which "nontreaty fishermen might be subjected to any reasonable state fishing regulation serving any legitimate purpose, [but] treaty fishermen are immune from all regulation save that required for conservation." Fishing Vessel, 443 U.S. at 682 (citing Antoine v. Washington, 420 U.S. 194, 207-08 (1975); Puyallup Tribe v. Department of Game, 391 U.S. 392, 398 (1968); Tulee, 315 U.S. at 684; Winans, 198 U.S. at 384; Ward, 163 U.S. at 504). We will not decide today whether, as the district court held, these cases mean that the State must allow treaty fishers to establish their own code. However, the stipulation between the Bands and the State appears to meet the conservation necessity standard, and thus we will not disturb it at this time.

[44]The Landowners called our attention to the Supreme Court's recent opinion in Printz v. United States, 117 S.Ct. 2365 (1997). In Printz, the Court struck down a portion of the Brady Act which required state officers to implement a federal regulatory program as violative of the Tenth Amendment. Printz is not relevant to the decision in this case. There is no federal law commanding state regulation here. In fact, the State voluntarily stipulated to the Bands' Conservation Code and Management Plan regarding regulatory issues. In addition, this is a case about state law infringing on rights guaranteed by federal law, and there is no question that federal courts have the power to order state officials to comply with federal law. Printz, 117 S.Ct. at 2382 n.16 (citing New York v. United States, 505 U.S. 144, 179 (1992)); see also Fond du Lac, 68 F.3d at 256 n.3.

Finally, the rule that Congress can abrogate treaty rights with the Indians only when its intention is expressed clearly and plainly counsels against application of the equal footing doctrine herein. In <u>United States v. Dion</u>, 476 U.S. 734 (1986), a unanimous opinion, the Supreme Court stated that "[w]hat is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." <u>Id.</u> at 739-40. The defendants have presented no evidence surrounding the legislation admitting Minnesota into the Union from which we could conclude that Congress intended to abrogate the 1837 Treaty rights.

VIII.

<u>Moderate Living Doctrine</u>

In <u>Fishing Vessel</u>, the Supreme Court first articulated the "moderate living doctrine." The Court held that certain treaty language entitled the plaintiff Indian tribes to a presumptive fifty percent share of all harvestable fish passing through "usual and accustomed" fishing runs. 443 U.S. at 670. The Court then limited its holding by stating that this presumptive fifty percent take is a maximum, not a minimum, and can be reduced "if tribal needs may be satisfied by a lesser amount." <u>Id.</u> at 685. The Court emphasized that "the central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living." <u>Id.</u> at 686.

The Landowners and the Counties contend that this language from <u>Fishing Vessel</u> should be applied in this litigation to mean that "the level of treaty harvest allowable is measured by the Bands' economic need." These parties contend that the court should take all sources of income to the Bands into account, find that the Bands

have achieved a moderate standard of living, and hold that the treaty right has either been extinguished or limited to exercise for ceremonial purposes only.[45]

The district court addressed these arguments in Mille Lacs IV, splitting them into two separate issues. 952 F. Supp. at 1385-94. First, the court assessed whether resource allocation was necessary at all. See id. at 1385-89. It determined, agreeing with the Bands, that "before a party can receive the equitable relief of allocation, the party seeking an allocation must establish that their right to a fair share of a particular harvestable resource has been substantially or irreparably injured as a result of the other party's harvest of such resource." Id. at 1389.

The court then addressed the moderate living doctrine. According to the court, all defendants below argued that "before the allocation of a resource should be quantified, the Court must first determine whether or not the Bands have achieved a moderate standard of living," looking to all sources of income to make this determination. Id. The court concluded, examining Fishing Vessel, that

> [w]hat Passenger Fishing Vessel and its predecessors establish is this: if an allocation of a resource must be made, such allocation should be quantified to fulfill the purposes of the treaty, while at the same time recognizing the rights of non-Indian harvesters to a resource. Thus, the threshold issue is not whether the Bands have achieved a moderate standard of living, but what was the purpose and intent of the treaty, and what amount of resources are needed to fulfill such purpose and intent.

---

[45]The Landowners connect this argument to an equal protection argument, urging that economic need is the only "compelling interest" that might justify "different treatment" between "two classes of citizens." Even if this argument were otherwise properly raised and applicable, it ignores the obvious fact that the "class of citizens" with treaty rights is not Native Americans generally, but only those Bands which signed the 1837 Treaty.

> Where it is determined that the resource cannot meet the needs of both the non-Indians and the Bands, an allocation should be made.

Mille Lacs IV, 952 F. Supp. at 1393. It then determined that the 1837 Treaty provides the Bands "the right to continue a way of life based on hunting, fishing and gathering." Id. (emphasis omitted). Since the Bands had not yet had the opportunity to choose to continue with such a way of life, the court declined to address the moderate living doctrine. Id. at 1394.

We first address whether the district court erred in refusing to make an allocation, beginning with a discussion of Fishing Vessel, which is crucial to our understanding of the issue.[46] The litigation which led to the Fishing Vessel decision was a dispute over tribal fishing rights in the Pacific Northwest, obtained under various treaties negotiated by Isaac Stevens, Governor and Superintendent of Indian Affairs in Washington Territory in the 1850s (the Stevens Treaties). The signatory tribes ceded lands to the United States, but reserved "the right of taking fish, at all usual and accustomed grounds and stations . . . in common with all citizens of the Territory." In 1970, the United States, on its own and as trustee for seven Indian Tribes, brought suit

---

[46]Below, the State had asserted that allocation was necessary because the demand for certain resources exceeded the available supply. Mille Lacs IV, 952 F. Supp. at 1386. The State was following the reasoning of LCO VII, 740 F. Supp. at 1414, which allocated harvest of antlerless deer because of heavy competition for the species. See Mille Lacs IV, 952 F. Supp. at 1386-88. On appeal, the State does not challenge the district court's decision not to make an allocation on this basis. Although the Landowners and the Counties term their arguments as driven by the moderate living doctrine, they hit upon the initial allocation issue. There is of course significant overlap between the issue of allocation and the moderate living doctrine issue; therefore, we shall address them both. We do not, however, express an opinion on the appropriateness of the allocation made in LCO VII. For further explanation of the LCO litigation and its numerous district court opinions, see Mille Lacs IV, 952 F. Supp. at 1388.

against the State of Washington, seeking an interpretation of the treaties and an injunction requiring the State to protect the Tribes' share of runs of anadromous fish. Fishing Vessel, 443 U.S. at 669-70. The Supreme Court rejected the State's argument that the language in the Stevens Treaties reserves to the Tribes only an equal opportunity to take fish passing through traditional tribal fishing areas. Id. at 681-83. It held instead that the treaties secured the right to take a share of each run of fish. See id. at 683 ("[T]he treaty secured the Tribe's right to a substantial portion of the run, and not merely a right to compete with nontreaty fishermen on an individual basis."). It then noted that "an equitable measure of the common right should initially divide the harvestable portion of each run that passes through a 'usual and accustomed' place into approximately equal treaty and non-treaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount." Id. at 685. The district court "start[ed] with a 50-50 division and adjust[ed] slightly downward on the Indians' side when it became clear that they did not need a full 50%." Id. The Supreme Court affirmed this apportionment.

The Court's discussion of apportionment and the context of the Fishing Vessel litigation make it clear that the Court's concern in apportioning the fish harvest was twofold. First, it saw the district court's apportionment as necessary to protect the scarce natural resources at stake. See id. at 669 ("[N]either party realized or intended that their agreement would determine whether, and if so how, a resource that had always been thought inexhaustible would be allocated between the native Indians and the incoming settlers when it later became scarce."); id. at 686 (noting that the district court "realized that some ceiling should be placed on the Indians' apportionment to prevent their needs from exhausting the entire resource and thereby frustrating the treaty rights of 'all [other] citizens of the Territory'"); see also Dana Johnson, Comment, Native American Treaty Rights to Scarce Natural Resources, 43 U.C.L.A. L. Rev. 547, 549 (1995) (asserting that the Fishing Vessel litigation began because in the period preceding the institution of the suit, the anadromous fish stock in Washington had drastically declined). Second, the Court interpreted the Stevens

Treaties as securing to "both sides . . . a right to take a fair share of the available fish." Fishing Vessel, 443 U.S. at 684-85 (emphasis added). According to this interpretation, the "in common with" language included in the treaty guarantees fishing rights to both treaty and nontreaty fishers. Thus, the Court was concerned that its decision ensure that "neither party . . . deprive the other of a 'fair share' of the runs." Id. at 684. Such deprivation was possible and even had begun to happen in Fishing Vessel, because of the migratory nature of anadromous fish, which hatch in fresh water, migrate to the ocean where they reach mature size, and eventually complete their life cycle by returning to the fresh-water place of their origin to spawn. Id. at 662. This life cycle, and the modern fishing practices of nontreaty fishers, meant that the nontreaty fishers "had the potential to harvest all of the steelhead and salmon before they ever reached the Indians' fishing grounds." LCO III, 653 F. Supp. at 1434. Nontreaty fishers had dominated the fisheries and excluded most treaty fishers from participation. Fishing Vessel, 443 U.S. at 668-69. Thus, Indian treaty rights which had once been exercised freely had become significantly impinged, leading to the lawsuit and ultimately, to allocation.

The dual concerns of the Fishing Vessel Court which led to an equitable apportionment (and subsequent reduction under the moderate living doctrine) are simply not present in the litigation at bar. First, there has been no showing here that any resource at issue is in ecological danger. See LCO III, 653 F. Supp. at 1434 (refusing allocation because "[n]either party has presented evidence that any particular species is endangered in the ceded territory"). The State and the Bands have agreed to a Conservation Code and Management Plan which will govern the Bands' management of their members' hunting, fishing, and gathering activities. Mille Lacs IV, 952 F. Supp. at 1366. The State and the Bands have also agreed to "a series of Protocols to coordinate harvest management and resource assessment." Id. at 1366-67. At oral argument, the State conceded that its position was that under the Code, there was no danger of depletion of resources. It appears to us that the parties have taken careful steps to ensure conservation of Minnesota's natural resources, and should be

commended for doing so. The Conservation Code and Management Plan they have drawn up is in effect an allocation of resources between treaty and nontreaty harvesters. It is understandable that the Counties and Landowners, neither of which was a party to the stipulation agreeing to the Code and Plan, dispute the de facto allocation made therein. However, the Counties and Landowners have not made a showing of scarcity of a resource under the Code and Plan that convinces this court that the district court should have used its equitable powers and mandated a further allocation.

The second concern of the Court in Fishing Vessel was the infringement of the treaty rights of the Indians. This concern was noted by the district court in this case, which held that "before a party can receive the equitable relief of allocation, the party seeking an allocation must establish that their right to a fair share of a particular harvestable resource has been substantially or irreparably injured as a result of the other party's harvest of such resource." Mille Lacs IV, 952 F. Supp. at 1389. We agree that this rule, when combined with an allowance for apportionment for conservation necessity, is the standard set by Fishing Vessel.

It must be remembered, however, that the standard was applied only after a determination that each party had a right to a fair share of the resource, based on the Court's interpretation of the treaty language. See Fishing Vessel, 443 U.S. at 680-85. There has been no argument or ruling here regarding the existence and nature of nontreaty fishers' rights under the language of this treaty. In addition, the Counties and Landowners have not made a showing that their right, whatever it may be, to any resource has been harmed. For these reasons, we must reject their pleas for apportionment.

The above discussion of apportionment, however, does not entirely answer the defendants' arguments in this area. The Counties and Landowners contend that the moderate living doctrine establishes a separate right to apportionment whenever it can be proven that holders of a treaty right have achieved a moderate standard of living

through any source or sources of income.  We agree with the Bands' assertion to the court below—that this analysis is "a serious misconception about the function of the moderate standard of living doctrine."  Mille Lacs IV, 952 F. Supp. at 1389.  The doctrine was applied by the Supreme Court in Fishing Vessel after the district court had made an apportionment of a natural resource between treaty and nontreaty users of that resource.  The moderate living doctrine does not establish a right to apportionment, but is rather a part of the method of apportionment once a court has determined that division of a resource is necessary.  See Fishing Vessel, 443 U.S. at 685-86.  Since we have determined that apportionment is not necessary in this case, we, like the district court, have no occasion to consider the moderate living doctrine.

In sum, we hold that under Fishing Vessel, an equitable apportionment in a treaty case such as this is not appropriate unless one of two conditions is met:  (1) conservation of the resource makes apportionment necessary; or (2) the existence and scope of a party's right to the resource has been determined, and that right is substantially harmed due to another party's harvest of that resource.  Further, we hold that the moderate living doctrine itself cannot be applied to require apportionment. Rather, the doctrine may be appropriate to consider if in the future an allocation under the above standard is necessary.[47]

---

[47]We note that a portion of Mille Lacs IV could be read to indicate otherwise. At one point in that opinion the court states that the moderate living doctrine should be applied to fulfill the purpose and intent of a treaty, "while at the same time recognizing the rights of non-Indian harvesters to a resource."  952 F. Supp. at 1393.  The court then acknowledges the Mille Lacs I's determination as to the purpose of the treaty, which was to provide the Bands "the right to continue a way of life based on hunting, fishing and gathering."  Id. at 1393.  Finally, the court holds that

the Bands must be given the opportunity to choose whether or not to continue with a way of life that is based on hunting, fishing and gathering. At this time, the Bands have not had the opportunity to make that choice, as the State has not allowed them to exercise their rights without the

IX.

<u>Additional Defenses Claimed by the Counties</u>

The Counties appeal the denial of two additional defenses. First, they contend that because the Wisconsin Bands sued Wisconsin officials for violating their 1837 Treaty rights in <u>LCO</u>, they are barred by res judicata from suing Minnesota officials for violating the same rights. They contend that <u>Nevada v. United States</u>, 463 U.S. 110 (1983), where the Supreme Court carved out a narrow exception to the mutuality rule, applies here to bar the Bands' suit. We disagree. The proceedings in <u>Nevada</u> were unique; they involved comprehensive water rights adjudication, in which many non-party water appropriators had relied on a prior decree as much as the parties to the action, making res judicata appropriate because of the special need to finally quantify reserved water rights. <u>See</u> <u>Nevada</u>, 463 U.S. at 143-44. The district court was correct in holding that res judicata does not apply. <u>See</u> <u>Mille Lacs III</u>, slip op. at 34-36.

_____

threat of state regulation. Until the Bands have had a reasonable opportunity to exercise their treaty rights, this Court will not address the moderate standard of living doctrine.

<u>Id.</u> at 1394. We are concerned that this portion of this discussion could be misconstrued to allow reduction of the Bands' portion of a harvestable resource if the Bands choose not to continue a way of life based on hunting, fishing, and gathering. We therefore emphasize that the district court states clearly that it will not address the allocation issue until a showing has been made under "Section III, A" of its opinion, which determines that allocation is appropriate only where a party's fair share of a resource has been substantially or irreparably injured. <u>Id.</u> at 1389. As noted above, we add to this holding by reading <u>Fishing Vessel</u> to require allocation when an allocation is necessary to conserve a natural resource or a party's right to a portion of the resource at issue.

Second, the Counties argue that the Wisconsin and Fond du Lac Bands do not hold usufructuary rights in the Minnesota portion of the 1837 ceded territory because, allegedly, none of these Bands used and occupied the area at the time of the Treaty. The district court rejected the argument.  See Mille Lacs III, slip op. at 39; Fond du Lac, slip op. at 36-37.  All of the cases cited by the Counties in support of its argument include treaty language which supports a limitation on the scope of the right.  The 1837 Treaty does not tie usufructuary rights to historic use or occupancy, and thus the Counties' urgings defy the plain language of the Treaty.  We affirm the district court on this issue.

X.

Additional Defenses Claimed by the Landowners

The Landowners make myriad additional arguments, including (but not limited to) the following:[48] (1) the Bands' claims are barred by various statutes of limitations; (2) the district court lacked § 1983 jurisdiction; (3) Landowners are entitled to a new Phase I trial because the district court exhibited a "pattern of unfairness" which prejudiced the Landowners; (4) the government's survey and sale of land to settlers constituted a revocation of the 1837 Treaty rights; (5) treaties of 1863 and 1864 and the Nelson Act establish state regulation over the hunting and fishing activities of the Bands; and (6) this court should reinstate the Landowners' counterclaims against the

[48]The Landowners' briefs do not help us to sort out the substantive arguments they make.  While their combined briefs deal substantively with approximately twenty-three issues, the briefs list forty-seven issues in a "Statement of Issues" spanning thirteen pages not numbered to be included in the page count.  This technique is, of course, an attempt to avoid reasonable page limitations imposed by this court.  For the sake of  brevity, we have not mentioned each and every argument raised by the Landowners, but those we do not mention, we have considered and reject.

United States if we determine that the 1837 Treaty rights exist. We have given these arguments full consideration and have determined them to be without merit.

XI.

The Bands' Cross-Appeal

In Phase I of the Mille Lacs case, the district court held that since the 1837 Treaty rights do not include a right of access, Band members may exercise their rights only on public lands and private lands open to public hunting, fishing, and gathering. Mille Lacs II, 861 F. Supp. at 836. In Phase II, the parties sought a definition of "private lands open to public hunting, fishing, and gathering." Mille Lacs IV, 952 F. Supp. at 1376. The Bands argued that the phrase included "private lands that are undeveloped, non-agricultural and non-posted lands, which, according to statute, are open to the public for hunting." Id. at 1377 (citing Minn. Stat. § 97B.001). Minn. Stat. § 97B.001 provides that any person may hunt on private land that fits the above description if such person has not been notified orally that they may not enter the land by the owner, occupant, or lessee of the private land. The court in Phase II held that the lands falling under Minn. Stat. § 97B.001 are not lands upon which the Bands may exercise their rights, because "allowing the exercise of the usufructuary rights by owner consent would potentially provide individual Band members more rights than other Band members." Mille Lacs IV, 952 F. Supp. at 1378-79.

The Bands challenge this ruling on appeal, arguing that it is inconsistent with the Phase I decision. In response, the State argues that the second ruling merely clarified the first, and that the two rulings are consistent. We affirm. The Phase I and Phase II decisions are not inconsistent. In Phase I, the district court held that generally, the rights extend to "private lands open to public hunting, fishing, and gathering." Mille Lacs II, 861 F. Supp. at 836. The court, interpreting this holding in Phase II, accepted the State's argument that a "distinction between private lands open to the public

generally and indiscriminately and private lands to which owner consent is necessary is crucial." Mille Lacs IV, 952 F. Supp. at 1378. The distinction is well-reasoned and should not be disturbed by this court. See id. at 1378-79 (noting that if the Bands were allowed to fish and hunt on private lands subject to the discretion of the private landowners, law enforcement officers "would have the undue burden of having to contact private land owners to determine if consent was provided to certain individuals before being able to determine whether laws were violated").

## XII.

Conclusion

For the reasons set forth above, we affirm the district court's rulings in Mille Lacs I, Mille Lacs II, Mille Lacs III, Mille Lacs IV, and Fond du Lac. These five district court opinions, as well as this appeal, represent only a fraction of the effort extended by the parties and their counsel. We commend all of these participants for their work in presenting the important and complex issues involved in this expedited appeal.

Despite the 160 years that have passed since the signing of the Treaty, it remains good law. One of the hallmarks of our constitutional system is respect for the law, regardless of changing circumstances or the inevitable passage of time. This court is fully cognizant of the significant rights and interests maintained by all of the parties in this litigation. The parties have attempted in good faith by negotiation to resolve their differences. Failing to do so, the courts have the responsibility to decide the issues under prevailing rules of law. We are aware of the professed hardships and compromises all litigants on both sides of this litigation must endure. Yet we are confident that all parties recognize that we are a court of limited jurisdiction, and do not possess the power to rewrite the treaties or interpret them contrary to principles of settled law to accommodate one group over the other.

We commend particularly the State of Minnesota and the various Bands for their willingness to reach agreement regarding the valuable resources in the Conservation Code and Management Plan. We can only express hope that such spirit of cooperation will continue to prevail and that all parties will recognize the mutual rights of one another as now declared in this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.